UNITED STATES DISTRICT COURT        SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| CITRUS TRADING CORPORATION, | § | |
| | § | |
| Plaintiff, | § | |
| versus | § | CIVIL ACTION H-03-4869 |
| | § | |
| | § | |
| DUKE ENERGY LNG SALES, INC., | § | |
| | § | |
| Defendant. | § | |

# Opinion on Denial of Summary Judgment

1. *Introduction.*

Two companies contracted for the sale of gas. The seller ended the agreement after the buyer failed to adjust a required letter of credit. The buyer says it was entitled to notice. Both parties move for partial summary judgment. Both motions will be denied; it is factually unclear whether the parties' behavior created a mutual understanding of the contract.

2. *Background.*

On December 22, 1998, Citrus Trading Corporation and Duke Energy LNG Sales, Inc., entered a gas purchase contract – Duke would sell and Citrus would buy. The parties were obliged to exchange a base volume of gas. Additionally, for ten days each month, Citrus had the option of purchasing up to 25% of the base volume.

Mechanically, Duke delivered the gas to Citrus on credit. On the tenth of each month, Duke sent Citrus an invoice for the prior month's delivery. Citrus then paid the invoice by the twenty-fifth.

Under the contract, either party could end the agreement on two days written notice of a "triggering event." One of the eight events named was the occurrence of a "material adverse change." The provision, however, said that the change would not

support termination if Citrus established a letter of credit equal to the value of the preceding 60 days of gas sold, adjusted quarterly.

On November 28, 2001, when Standard and Poor's reduced the credit rating of Enron below BBB-, a material adverse change occurred. That same day, Duke demanded that Citrus acquire security. In response, Citrus established a credit for $10.3 million with a year-long life. When it expired in December 2002, Citrus extended the credit for another year and adjusted it to the value of the preceding sixty days of gas it had purchased.

Four months later – following the fifth quarter of the credit requirement being in effect – Duke terminated the contract for Citrus's failure to adjust.

Citrus says that it was entitled to notice and is seeking its cost to cover, lost benefit, and liquidated damages. Duke counterclaims for damages and a declaration that Citrus breached the contract, making its termination lawful. Citrus moves for partial summary judgment on the letter of credit issues. So does Duke.

3.  *Contract.*

Article four of the agreement deals with defaults and remedies. Specifically, in Article 4.2, it says that if there is a material adverse change, Duke is obliged to meet its responsibilities, so long as Citrus maintains a letter of credit. The provision reads:

> (vii) . . . such Material Adverse Change shall not be considered if the Affected Party establishes, and maintains . . . a Letter of Credit . . . in an amount equal to the sum of . . . :
>
> (a) the Notifying Party's Termination Payment plus
>
> (b) if the Notifying Party is Seller, the aggregate of the amounts the Seller is entitled to receive under each Transaction for Gas Scheduled during the 60 Day period preceding the Material Adverse Change (*the amount* of said Letter of Credit to be *adjusted quarterly* to reflect amounts owing . . . [emphasis added]

The parties agree that: (a) there was a material adverse change, (b) Citrus promptly established a credit, and (c) Citrus adjusted the credit at the end of the fourth quarter.

The dispute arose when Duke invoked the termination clause, claiming that Citrus failed to adjust the letter of credit automatically, according to Article 4.2(b). Citrus argues that Duke waived its right to automatic quarterly adjustments. It says that Duke should have told Citrus that it wanted an adjustment. In the alternative, Citrus argues that, if it did default, it was promptly cured and caused no harm.

4.  *Performance*

Duke says that, according to the agreement, it was entitled to end the contract when Citrus failed to adjust the credit following the fifth quarter. It argues that because the contract specifically requires notice for other actions, the exclusion here was intentional and should not be implied. The court's inquiry is not limited to the contract; it may also examine the parties' course of performance. TEX. BUS. & COMM. CODE. ANN. § 1.303(d).

The day that Enron's credit rating fell, Duke invoked the change clause, requiring that Citrus establish the first letter of credit by December 5, 2001. On December 4, Duke delivered its credit form to Citrus. It stated, " . . . this standby letter of credit will automatically extend, without amendment, for *one year* from the present . . ." [emphasis added] If Duke was truly concerned with quarterly adjustments, it could have demanded a letter that automatically expired each quarter, rather than each year. It did not. On the other hand, the text is the principal source for the contract's meaning and the parties' understanding of the agreement. Duke had no duty to furnish automatic safeguards.

Regardless, Duke required a letter with a year term. Then, eight days after the original credit was due, Citrus requested a twenty-one-day extension in exchange for early payment of the November invoice and prepayment for the December invoice. Duke granted the extension and Citrus established the credit on December 19.

The original credit remained in place following the first, second, and third quarters. Citrus – nor Duke – sought to adjust it in response to fluctuating prices. At the end of the fourth quarter, in December 2002, the credit expired, forcing the parties

to address Duke's security. Duke contacted Citrus and they exchanged e-mail correspondence. On December 16, after receiving Duke's calculations, Citrus increased the credit to $13.7 million.

In 2003, the parties' relationship became strained when Duke suffered a supply loss and refused to deliver Citrus more than the base volumes. On March 7, Citrus sued Duke for its breach of the contract on the supply question.

Then, on April 14, Duke first demanded strict compliance with the terms of the agreement. Duke told Citrus that it had terminated the contract because of Citrus's failure to increase the credit to $21.5 million, the sum of the preceding 60 days. Within twenty-four hours of this notice, Citrus had adjusted the credit, yet Duke persisted in the termination. Duke offers this for its abrupt demand: "Having sued Duke, Citrus could not have expected Duke to remind Citrus of its own letter of credit obligations." (Duke's Cross Mot. Summ. J. at 10).

Duke initiated the original credit. It furnished the specific language for the credit's term. It gave Citrus a fifteen-day extension to establish the security. Finally, it notified Citrus about the only adjustment required before termination. Although the text required automatic adjustments, Duke's consistent behavior may have waived its right to strict compliance. TEX. BUS. & COM. CODE ANN. § 2.208.

5.     *Notice, Materiality, and Cure.*

Citrus says that even if the credit was in default, because the contract did not designate a specific time for performance, it had a reasonable time to comply. TEX. BUS. & COM. CODE ANN. § 2.309(a). The contract did not say when each quarter began or ended. In this case, the contracted quarter may have started on: (a) December 5 – the original deadline for the first credit, (b) December 19 – the date Citrus actually established the credit, or (c) January 1 – the first day of the calendar year. Duke retorts that the contract calls for a specific time of performance – on or before the expiration of a three-month period. It contends that the most generous calculation requires Citrus to have adjusted by March 31, 2003. It argues that even applying that deadline, Citrus had had an additional fourteen days to comply before it sent the termination letter. Thus, it says, Citrus had a reasonable time to comply, yet breached the contract.

If Duke's actual behavior waived its right to automatic quarterly adjustments, Citrus was entitled to notice. Duke contests a notice requirement, asserting that the first three quarters of 2002 passed without Duke giving notice. It says, "assuming the two instances Citrus relies on constitute 'notice of the required amount,' it was more common for a quarter to pass without Duke giving such notice." (Duke's Cross Mot. Summ. J. at 14). This assertion only weakens Duke's case, highlighting that there were no adjustments in the first three quarters of 2002 and the only two adjustments were made with notice.

Finally, even if Citrus breached the contract, it is not clear that this breach was material. In the termination letter, Duke stated that the security should have been increased from $13.7 to $21.5 million. Citrus did that within twenty-four hours.

6. *Conclusion.*

It is clear that Duke wanted out of the contract with Citrus. Despite a thorough review of each parties' pleadings, it is unclear whether the termination was lawful. Neither party offers any suggestion or evidence of why Duke did not demand an adjustment in the second or third quarters. Evidence of volatile prices would support Citrus's contention that the termination was arbitrary. Of course, if Duke could have ended the contract for Citrus's error in furnishing security, it would not be wrong for it to be pleased to rid itself of an economically onerous contract. This uncertainty coupled with the limited extent of the performance under the contract precludes summary judgment by either side.

Signed August 23, 2005, at Houston, Texas.

_____
Lynn N. Hughes   USDJ
United States District Judge